# STATE OF MICHIGAN

# COURT OF APPEALS

---

JOHN DOES 1-7, and all others similarly situated,

Plaintiffs-Appellees,

v

DEPARTMENT OF CORRECTIONS, GOVERNOR, DEPARTMENT OF CORRECTIONS DIRECTOR, CORRECTIONAL FACILITIES ADMINISTRATION DEPUTY DIRECTOR, CORRECTIONAL FACILITIES ADMINISTRATION DEPUTY DIRECTOR RETIRED, CORRECTIONAL FACILITIES ADMINISTRATION CHIEF DEPUTY DIRECTOR, CARSON CITY CORRECTIONAL FACILITY WARDEN, GUS HARRISON CORRECTIONAL FACILITY WARDEN, RICHARD A. HANDLON CORRECTIONAL FACILITY WARDEN, OAKS CORRECTIONAL FACILITY WARDEN, THUMB CORRECTIONAL FACILITY WARDEN, CHIPPEWA CORRECTIONAL FACILITY WARDEN, MARQUETTE BRANCH PRISON WARDEN, BELLAMY CREEK CORRECTIONAL FACILITY WARDEN, CHARLES EGELER RECEPTION & GUIDANCE CENTER WARDEN, E.C. BROOKS CORRECTIONAL FACILITY WARDEN,

Defendants-Appellants.

FOR PUBLICATION
August 25, 2015

No. 321013; 321756
Washtenaw Circuit Court
LC No. 13-001196-CZ

---

Before: RIORDAN, P.J., and DONOFRIO and BECKERING, JJ.

BECKERING, J. (*concurring in part and dissenting in part*).

This case is about the alleged rape, sexual harassment, and physical assault of minors who are confined in adult prisons operated by the Michigan Department of Corrections. At issue in this appeal is the Legislature's attempt to shield the State from liability for its conduct in allegedly condoning, perpetuating, and even participating in such grievances—and any other

-1-

civil rights violations for that matter—upon our state's incarcerated individuals. Because I find that the Legislature's amendment of the Elliot-Larson Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*, specifically MCL 37.2301(b), by excluding prisoners from the scope of the act, is unconstitutional, I would affirm the trial court's denial of defendants' motion for summary disposition on this issue. Because I find that plaintiffs have stated a claim, I would also affirm the trial court's denial of defendants' motion for summary disposition pursuant to MCR 2.116(C)(8). Finally, because I am bound by precedent, I must concur with the majority's ruling with respect to plaintiffs' failure to comply with the disclosure requirements of the Prisoner Litigation Reform Act (PRLA), specifically MCL 600.5507(2), although dismissal would be without prejudice. Were I not bound by precedent, I would allow plaintiffs to file an amended complaint in compliance with MCL 600.5507(2).

## I. PRISON LITIGATION REFORM ACT

Defendants contend that plaintiffs failed to meet the disclosure requirements set forth in the Prison Litigation Reform Act (PLRA), MCL 600.5501, specifically MCL 600.5507(2), which provides that "[a] prisoner who brings a civil action or appeals a judgment concerning prison conditions shall, upon commencement of the action or initiation of the appeal, disclose the number of civil actions and appeals that the prisoner has previously initiated." The majority agrees with defendants, and so do I. And I am bound by precedent to agree that dismissal is the proper remedy.

When filing suit in this case, plaintiffs identified the following on the face of their complaint:

> A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in this court, where it was given docket number 13-1049-CZ and was assigned to Judge Kuhnke. The action is no longer pending.

> In addition, a civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has previously been filed in the Eastern District of Michigan and was assigned to Judge Cleland. The action remains pending.

I agree with the majority's opinion that the above disclosure has all the earmarks of a disclosure in accordance with MCR 2.113(C)(2), rather than an effort to comply with MCL 600.5507(2). Despite plaintiffs' assertions that the disclosure satisfies the PLRA requirements, like the majority, I must disagree. The disclosure failed to identify the parties of the previous litigation and left no clues as to how many other lawsuits plaintiffs previously initiated. The statute unambiguously mandates the disclosure of the number of civil actions previously initiated, "even when that number is zero." *Tomzek v Dep't of Corrections*, 258 Mich App 222, 225; 672 NW2d 511 (2003).

Although plaintiffs argue that the disclosure requirements of MCL 600.5507(2) apply only to civil actions filed by prisoners seeking indigency status, I agree with the majority that subsection (2) is not so limited. It broadly imposes the disclosure requirements on "[a] prisoner who brings a civil action" and does not qualify such language as applying only to a certain class of prisoner litigants. See *Barrow v Detroit Election Comm*, 301 Mich App 404, 414-415; 836 NW2d 498 (2013) (the Legislature's use of the indefinite article "a" refers to a general item, not a particular item). And for reasons that are adequately explained by the majority, there is no merit to plaintiffs' argument that either the context of the statute or the act's legislative history require a different result.

I write separately to voice my concerns about the proper interpretation of MCL 600.5507(3) concerning whether and when dismissal of a lawsuit is required. MCL 600.5507(3) provides in pertinent part that:

> (3) The court shall dismiss a civil action or appeal at any time, regardless of any filing fee that may have been paid, if the court finds any of the following:
>
> ***
>
> (b) The prisoner *fails to comply* with the disclosure requirements of subsection (2). [Emphasis added.]

As the majority notes, employment of the phrase "shall dismiss" deems an action mandatory, and this Court in *Tomzek*, 258 Mich App at 223, held that such phrase "mandates dismissal" "without regard to how or when the issue was raised." In light of *Tomzek*, I must concur in the result reached by the majority, although I would note that the dismissal is without prejudice.[1] My concern, however, is that this interpretation ignores the present tense aspect of subsection (3)(b), wherein it states that dismissal is required if the prisoner "fails to comply" with the disclosure requirements of subsection (2). Such phrase could be interpreted one of two ways in the context of the statute. One could conclude, as does *Tomzek* and the majority, that subsection (3) requires a civil action to be dismissed if the plaintiff failed to provide the necessary disclosure information in keeping with the temporal requirement of subsection (2), being "upon commencement of the action or initiation of the appeal."[2] However, one could also conclude that subsection (3) only requires dismissal if the plaintiff "fails to" comply with the disclosure requirement, meaning that he or she *has not* provided the disclosure information, and thus, he or she is subject to dismissal as a consequence of such failure.[3] The former interpretation is quite

---

[1] Given the majority's corresponding substantive rulings, the nature of dismissal with respect to the PRLA issue is rendered immaterial.

[2] MCR 2.101(B) describes "Commencement of Action" as follows: "[a] civil action is commenced by filing a complaint with a court."

[3] The present tense of a verb is used to "express *present time*" and to "make a statement that is *true at all times*." Sabin, *The Gregg Reference Manual* (11th ed) (New York: Glenco McGraw–Hill, 2011), p 313. A court is to interpret and enforce statutes as written, and "[t]his includes,

literal, and begets a "Simon Says" procedural requirement. The latter is more logical and comports with the present tense verb provided in subsection (3), as there is no discernible reason why a case should be dismissed if the plaintiff filed the disclosure, albeit not on the face of the initial complaint, but did in fact make the disclosure.[4] What is the point of dismissal if the plaintiff has complied and defendant has the necessary information required by subsection (2)? It would be a purely punitive measure, as dismissing a lawsuit even after the plaintiff has filed the necessary disclosure information would serve no other purpose, especially since subsection (2), as it applies to nonindigent prisoners, serves no apparent purpose.

Interpreting MCL 600.5507(3) as does the majority and *Tomzek* also creates fertile ground for gamesmanship. For instance, if a plaintiff fails to comply with the statute, nothing would prevent a defendant from waiting a year or two after the lawsuit is filed to raise the issue and gain dismissal of the suit. In fact, a defendant could litigate the matter on the merits, and upon receiving an unfavorable verdict, simply invoke the plaintiff's failure to timely comply with MCL 600.5507(2) as a post-judgment parachute. Given the present interpretation, dismissal would be required years into the litigation, even if the plaintiff had filed his or her disclosure shortly after filing the complaint. Put simply, MCL 600.5507, as previously interpreted by this Court, creates an escape hatch or "get out of jail free" card to be used at the leisure of the defendant. Had this Court not already interpreted the meaning of subsection (3), I would permit plaintiffs to file an amended complaint with the requisite disclosures under MCL 600.5507(2) such that dismissal would not be required.[5] MCR 7.215(C)(2).

## II. ELCRA AND CONST 1963, ART 1, § 2

"[W]hen you take away the freedom of equality or justice of any individual, you all suffer." Statement of Mr. Dade, 1 Official Record, Constitutional Convention 1961, p 743. Somewhat befitting of the present controversy, this statement was made in relation to the adoption of Const 1963, art 1, § 2, the provision at issue in this case. Yet, despite a clear constitutional mandate that the enabling legislation to be implemented in compliance with Const 1963, art 1, § 2, apply to *all* citizens, without limitation, in 1999 the Legislature attempted to take away the rights of prisoners who seek redress under the ELCRA. It is this exclusion from

---

without reservation, the Legislature's choice of tense." *Holland v Consumers Energy Co*, 308 Mich App 675, __ NW2d __ (2015), slip op at 5.

[4] One could also interpret more generally the phrase "upon commencement of the action," as used in MCL 600.5507(2), as meaning at the outset of the case, rather than necessarily being tied to the actual filing of the complaint.

[5] I note that plaintiffs were without the option of voluntarily dismissing the complaint in order to re-file and comply with the disclosure requirements because they had already voluntarily dismissed once, and a second voluntary dismissal would have operated as an adjudication on the merits. MCR 2.504(A)(1). I also note that the trial court, before ruling on defendants' motion for summary disposition based on the disclosure requirements, stated that it would give plaintiffs leave to amend if they wished. It does not appear that plaintiffs took the opportunity to amend at that time.

protection under the ELCRA that, in my opinion, renders the 1999 amendment to the ELCRA unconstitutional.

## A. STANDARD OF REVIEW

At issue in this case is the constitutionality of a 1999 amendment to the ELCRA, a question that we review de novo. See *Mich Dep't of Treasury v Tomkins*, 481 Mich 184, 190-191; 749 NW2d 716 (2008).[6] In my view, the constitutionality of the 1999 amendment turns on an examination of Const 1963, art 1, § 2 and the directive to the Legislature contained therein. "When interpreting the Constitution, our task is to give effect to the common understanding of the text[.]" *Lapeer Co Clerk v Lapeer Circuit Court*, 469 Mich 146, 155; 665 NW2d 452 (2003).

## B. DEVELOPMENT OF CIVIL RIGHTS LEGISLATION

## 1. THE MICHIGAN CONSTITUTION GUARANTEES PROTECTION TO ALL CITIZENS

Michigan's equal protection clause, set forth in Const 1963, art 1, § 2, provides:

> *No person* shall be denied the equal protection of the laws; nor shall *any person* be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature *shall implement* this section by appropriate legislation. [Const 1963, art 1, § 2 (emphasis added).]

The second clause in the first sentence of Const 1963, art 1, § 2 guarantees certain civil rights to all, as it provides that "nor shall *any person* be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin." This guarantee is made to "any person," without exclusion or qualification. The official record of the constitutional convention demonstrates that it was unquestionably the intent of the ratifiers that civil rights protections be extended to *any* and *all* persons.[7] Indeed, the record emphasized that art 1, § 2 was in line with the "distinct trend in state constitutions" that "civil rights clauses apply to *all persons . . . .*" 1 Official Record, Constitutional Convention 1961, p 740 (emphasis added). A committee report from the constitutional convention states that the ratifiers intended

> that *each of our citizens, all of our citizens*, shall enjoy equal protection of the law *in all areas of living* which involve fundamental human rights, fundamental civil rights in this our beloved state of Michigan.

---

[6] In reviewing the constitutionality of the statute, this Court is to presume that the statute is constitutional, and we are "to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Smithkline Beecham Corp*, 468 Mich 1, 6; 658 NW2d 127 (2003).

[7] "Records of the constitutional convention may be consulted to ascertain the intent of the provision" at issue. *Kuhn v Secretary of State*, 228 Mich App 319, 324; 579 NW2d 101 (1998).

Such intent, the intent that *each of Michigan's citizens* have "equal access" to the "fundamental rights in our complex society" . . . should in our opinion be stated simply and clearly . . . ." [1 Official Record, Constitutional Convention, 1961, p 741 (emphasis added).[8]]

While the second clause of the first sentence mandates to whom protections are to apply, the second sentence of art 1, § 2 imposes a mandate on the Legislature: "[t]he legislature *shall implement* this section by appropriate legislation." The directive given to the Legislature is a mandatory one. See *Co Rd Assoc of Mich v Governor*, 260 Mich App 299, 306; 677 NW2d 340 (2004), aff'd in part 474 Mich 11 (2005) (when interpreting a provision of the Michigan Constitution, "[i]t is well-established that the use of the word 'shall' rather than 'may' indicates a mandatory, rather than discretionary, action."). Thus, when read in combination, Const 1963, art 1, § 2 provides that the Legislature *must* enact legislation protecting the rights of *any or all* persons, without limitation. In short, art 1, § 2 required the enactment of legislation designed to protect the civil rights of *all*, and the mandatory nature of such language makes apparent that the Legislature was without authority to exclude anyone from protection under the resulting legislation.

## 2. THE LEGISLATURE COMPLIES WITH MANDATORY ENABLING ACT REQUIREMENTS

In response to the mandate imposed by our Constitution, the Legislature enacted the Civil Rights Act, now known as the Elliot-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.* The act was intended to "centralize and make uniform the patchwork of then-existing civil rights statutes" in the private sector and to "broaden the scope of the then-existing civil rights statutes to include governmental action." *Neal v Department of Corrections (Neal II)*, 232 Mich App 730, 738; 592 NW2d 370 (1998). See also *Forton v Waterford Twp Dep't of Parks & Recreation*, 425 Mich 173, 186; 387 NW2d 821 (1986). The ELCRA provides that a person shall not

"[d]eny *an individual* the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or *public service* because of religion, race, color, national origin, age, sex, or marital status." MCL 37.2302(a) (emphasis added).

---

[8] Although various drafts of art 1, § 2 were proposed throughout the process of drafting the Constitution, the notion that "each person" was entitled to civil rights protection or that "no person" shall be denied civil rights was maintained throughout the constitutional convention. 1 Official Record, Constitutional Convention 1961, p 739-742, 749, 995; 2 Official Record, Constitutional Convention 1961, p 2887-2889.

MCL 37.2301(b), as enacted in 1976, defined "public service" as

> a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public.

The above definition of public service remained unchanged for over 20 years.

In the mid 1990s, a group of women housed in facilities operated by the MDOC filed a class-action suit against the MDOC alleging that male corrections personnel were systematically engaging in a pattern of sexual harassment of female inmates. *Neal v Dep't of Corrections*, 230 Mich App 202; 583 NW2d 249 (1998) (*Neal I*). Specifically, plaintiffs complained that

> the MDOC assigns male officers to the housing units at all women's facilities without providing any training related to cross-gender supervision; that women are forced to dress, undress, and perform basic hygiene and body functions in the open with male officers observing; that defendants allow male officers to observe during gynecological and other intimate medical care; that defendants require male officers to perform body searches of women prisoners that include pat-downs of their breasts and genital areas; that women prisoners are routinely subjected to offensive sex-based sexual harassment, offensive touching, and requests for sexual acts by male officers; and that there is a pattern of male officers' requesting sexual acts from women prisoners as a condition of retaining good-time credits, work details, and educational and rehabilitative program opportunities. [*Id* at 205.]

In *Neal I*, this Court initially held that prisons were not a place of "public service" as the term is used in the ELCRA. *Id.* at 215. However, on rehearing, this Court held that prisons are places of "public service" and that the ELCRA was intended to protect prisoners, among others. *Neal II*, 232 Mich App at 736-738.

### 3. IN RESPONSE TO *NEAL*, THE LEGISLATURE ATTEMPTS TO CARVE OUT PRISONERS FROM ALL CIVIL RIGHTS PROTECTIONS UNDER THE ENABLING ACT

In response to *Neal II*, in 1999 the Legislature attempted to carve out from protection under the ELCRA one subset of individuals—persons in our state who are incarcerated. To do so, the Legislature amended the definition of "public service" as the term is used in the ELCRA. The term "public service" is now defined in the statute to mean:

> a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public, *except that public service does not include a state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment*. [MCL 37.2301(b) (emphasis added).]

As if there were any doubt that the 1999 amendment was intended to specifically exclude prisoners, 1999 PA 202 stated that the amendment to the ELCRA was:

> curative and intended to correct any misinterpretation of legislative intent in the court of appeals decision Neal v Department of Corrections, 232 Mich App 730 (1998). This legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility is not within the purview of this act.

In light of that clear intention to exclude prisoners from the scope of the ELCRA's protections, it is undisputed that the 1999 amendment would prohibit the instant litigation. The remaining inquiry, in my mind, should focus on whether the Legislature had authority to enact such an exclusion in the first instance.

### C. THE 1999 AMENDMENT VIOLATES A CONSTITUTIONAL MANDATE

The parties and the majority frame the issue at hand as one calling for a determination of whether the 1999 amendment to the ELCRA violates equal protection by denying prisoners, as a class, protections under the ELCRA. In my opinion, this focus is directed at the wrong section of Const 1963, art 1, § 2. I believe that the analysis misses a more significant and dispositive issue. That is, whether the Legislature has authority, given the constitutional directive in Const 1963, art 1, § 2 pertaining to *all citizens*, to carve out a particular class of individuals and exclude them from the protections of the ELCRA.

I would hold that the Legislature acted outside of its constitutional authority by removing prisoners from the scope of the ELCRA and thereby denying protection to all. Where the analysis in this case should start, and end, in my opinion, is with the idea that Const 1963, art 1, § 2 contains more than just the guarantee of equal protection of the laws; it contains a directive to the Legislature to implement legislation that protects the rights of *all* citizens. Again, that clause provides:

> *No person* shall be denied the equal protection of the laws; nor shall *any person* be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation. [Const 1963, art 1, § 2 (emphasis added).]

As noted, the necessary corollary of the phrase "nor shall any person be denied the enjoyment of his civil rights" is that *all* persons, without exclusion, are entitled to have certain civil rights protected by "appropriate legislation." The problem with the 1999 amendment to the ELCRA is that, by excluding a certain class of individuals—prisoners—from the protections of the ELCRA, the Legislature has acted in a way that is contrary to Const 1963, art 1, § 2.[9]

---

[9] From the outset, the 1999 amendment was a legislative attempt to exclude prisoners from ELCRA protection, following the State being held accountable for the assault of female prisoners

Thus, rather than honoring the constitutional mandate to implement civil rights legislation as to "all," the 1999 amendment expressly excludes prisoners from any protection under the ELCRA. The mandates and directives of Const 1963, art 1, § 2 could not have been clearer. Const 1963, art 1, § 2 did not state that the Legislature "shall implement" the civil rights guarantees provided to those whom it deems worthy of receiving such protection. Rather, the constitution clearly and explicitly provides that "[n]o person" shall be denied equal protection" "nor shall any person be denied" the enjoyment of his civil rights. Such language leaves no room for reservation or qualification. The Legislature cannot ignore that plain, unambiguous constitutional mandate. Indeed, "[a] fundamental and indisputable tenet of law is that a constitutional mandate cannot be restricted or limited by the whims of a legislative body through the enactment of a statute." *AFSCME Council 25 v Wayne Co*, 292 Mich App 68, 93; 811 NW2d 4 (2011). Given that the resulting civil rights legislation was to apply to "any person" without limitation, the Legislature could no sooner enact an amendment to the ELCRA excluding prisoners from the scope of the statute as it could decide to exclude from the act blue-eyed individuals, African-Americans, or anyone named "Steve." See *id.* See also *Durant v State Bd of Ed*, 424 Mich 364, 392; 381 NW2d 662 (1985) ("The state may not avoid the clear requirements [of a constitutional mandate] either by specific statute or by implementation of definitions adverse to the mandate of the people."). To the extent a statute infringes on a constitutional directive, the statute must "succumb to the primacy of the Michigan Constitution." *AFSCME Council 25*, 292 Mich App at 95. Because the 1999 amendment excluding prisoners from protection under the ELCRA is incongruous with the directives contained in Const 1963, art 1, § 2, it violates the Michigan Constitution and cannot stand.[10] Where the ratifiers saw fit to extend the protections under Const 1963, art 1, § 2, to "any person," the Legislature was without authority to enact legislation denying those protections to a particular group of individuals. See *id.*

To this end, the instant situation is analogous to our Supreme Court's decision in *Midland Cogeneration Venture Ltd Partnership v Naftaly*, 489 Mich 83; 803 NW2d 674 (2011). That case concerned whether MCL 211.34c(6) could prevent aggrieved parties from appealing a decision of the state tax commission regarding classification complaint decisions. *Id.* at 87-88. The constitutional provision at issue, Const 1963, art 6, § 28, guaranteed judicial review of administrative decisions—assuming the administrative decision met certain requirements—and provided that those decisions "shall be subject to direct review by the courts *as provided by law*."

in *Neal II*. Indeed, as noted, 1999 PA 202 was never shy about the notion that it expressly intended to exclude prisoners from the scope of protection under the ELCRA. The act stated that "[t]his legislation further expresses the original intent of the legislature that an individual serving a sentence of imprisonment in a state or county correctional facility *is not within the purview of this act*."

[10] In this regard, it matters not whether prisoners, although they are excluded from the protections of the ELCRA, can obtain injunctive or declaratory relief for certain civil rights violations under Const 1963, art 1, § 2. Instead, what matters is what the constitution *requires*— that the Legislature enact statutes protecting the civil rights of all—and what the Legislature *did*—it enacted statutes protecting the civil rights of all, *except for prisoners*. The decision to exclude prisoners violated the "any person" mandate and is unconstitutional.

(Emphasis added). The defendants in that case argued that the "as provided by law" language meant that the Legislature could implement limited judicial review. *Midland Cogeneration Venture Ltd Partnership*, 489 Mich at 93. This Court agreed. See *Iron Mt Info Mgt, Inc v State Tax Comm*, 286 Mich App 616, 621; 780 NW2d 923 (2009). However, our Supreme Court reversed, holding that while "as provided by law" meant that the Legislature could enact legislation as to the *manner* in which judicial review occurred, it could not preclude judicial review, as such judicial review was mandated by the Constitution. *Midland Cogeneration Venture Ltd Partnership*, 489 Mich at 94. The Court held that "[t]he Legislature may not eradicate a constitutional guarantee in reliance on the language" in the same constitutional amendment granting certain implementation authority to the Legislature. *Id.* Further, the Court explained that the implementing language at issue in that case did "not grant the Legislature the authority to circumvent the protections that the section guarantees. If it did, those protections would lose their strength because the Legislature could render the entire provision mere surplusage." *Id.* at 95.

Turning back to the instant case, the Legislature is not permitted, pursuant to the implementation language contained in Const 1963, art 1, § 2, to define the persons to whom civil rights are guaranteed. The Constitution already answers that question, unequivocally guaranteeing that legislation to protect civil rights must be extended to all, without reservation or limitation. Any implementation language contained in Const 1963, art 1, § 2 should not be construed as giving the Legislature "the authority to circumvent the protections that the section guarantees." See *id.* If it did, just as the Court cautioned in *Midland Cogeneration Venture Ltd Partnership*, the protection of "any person" would "lose [its] strength" and the Legislature would render meaningless such protection. See *id.* Consequently, I would find that the 1999 amendment, by eradicating a constitutional guarantee, violates Const 1963, art 1, § 2.

Moreover, our Supreme Court in *Sharp v Lansing*, 464 Mich 792; 629 NW2d 873 (2001), has recognized that the implementation mandate found in Const 1963, art 1, § 2 does not confer discretion on the Legislature to change the mandated protections found in art 1, § 2. Despite the fact that it was given authority to *implement* the constitutional protections at issue, the Legislature was not given authority to *define* those protections in a manner that was inconsistent with the Constitution.

> While the second sentence of art 1, § 2 commits its affirmative "implementation" to the Legislature, the first sentence of this constitutional provision commands that "[n]o person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color, or national origin." The duty imposed on the Legislature by the second sentence of art 1, § 2 to *implement* art 1, § 2 is not a power to ultimately *define* the substantive meaning of the first sentence. [*Sharp*, 464 Mich at 801-802.]

Here, the Legislature went beyond its authority of implementing art 1, § 2 by "appropriate legislation" and attempted to define the meaning of the constitutional mandate by narrowing the scope of protected individuals. Where the constitution mandated that the Legislature was to provide "by appropriate legislation" certain protections to everyone, without reservation or limitation, the Legislature was not justified in excluding some from that protection.

As further illustration of the constitutional violation occasioned by the 1999 amendment, I compare the instant constitutional provision to Const 1963, art 4, § 52, which provides for the preservation of natural resources and requires the Legislature to take action to do so:

> The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. *The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.* [Emphasis added.]

"[I]t is clear that [the second sentence of art 4, § 52] must be read as a mandatory command to the legislature." *State Hwy Comm v Vanderkloot*, 392 Mich 159, 180; 220 NW2d 416 (1974) (opinion by WILLIAMS, J). See also *Genesco, Inc v Mich Dep't of Environmental Quality*, 250 Mich App 45, 54; 645 NW2d 319 (2002) (recognizing that the duty imposed on the Legislature to protect the state's natural resources is mandatory).[11] Consider the following hypothetical scenarios. Consistent with the mandate in Const 1963, art 4, § 52, could the Legislature decide that the protection of water and other natural resources was desirable, but deem the protection of air too inconvenient, and enact legislation stating that there are to be no regulations as to air quality or air pollution? Or, for that matter, could the Legislature decide to protect air, water, and natural resources from destruction, but enact legislation stating that there was to be no regulation, whatsoever, with regard to the pollution of those same resources? Surely no one would argue that these hypothetical legislative enactments would be constitutional, as they clearly violate the constitutional mandate set forth in Const 1963, art 4, § 52. Yet, that is precisely what has occurred in this case. In enacting the 1999 amendment to the ELCRA, the Legislature has declined to honor the entire constitutional mandate found in Const 1963, art 1, § 2.

As a result, I would hold that the 1999 amendment to the ELCRA is unconstitutional. I would affirm the trial court's ruling, albeit for the reasons stated above rather than finding that the statute violates equal protection guarantees. See *Messenger v Ingham Co Prosecutor*, 232 Mich App 633, 643; 591 NW2d 393 (1998) ("When this Court concludes that a trial court has reached the correct result, this Court will affirm even if it does so under alternative reasoning."). Given this conclusion, there is no need to evaluate the exclusion of prisoners from the scope of the ELCRA on equal protection grounds.[12] The analysis of the constitutionality of the 1999 amendment should begin with the directive given to the Legislature in Const 1963, art 1, § 2 and end with the conclusion that the 1999 amendment is constitutionally infirm because it is contrary to the directive contained in art 1, § 2. See *Midland Cogeneration Venture Ltd Partnership*, 489 Mich at 94; *AFSCME Council 25*, 292 Mich App at 93.

---

[11] To comply with this constitutional provision, the Legislature enacted what is now known as the Natural Resources and Environmental Protection Act, MCL 324.101, *et seq.* See *Genesco*, 250 Mich App at 54.

[12] Nevertheless, as discussed below, I would find that the amendment cannot withstand an equal protection challenge.

## III.  EQUAL PROTECTION

While I find it unnecessary to perform an equal protection analysis, I would agree with the trial court that the 1999 amendment, even assuming it did not violate the constitutional authority conferred upon the Legislature, amounted to an equal protection violation.

"Equal protection is guaranteed under the federal and state constitutions." *Morales v Mich Parole Bd*, 260 Mich App 29, 49; 676 NW2d 221 (2003), citing US Const, Am XIV; Const 1963, art 1, § 2.  The Equal Protection Clause requires that all persons similarly situated be treated alike under the law; it does not guarantee that people in different circumstances will be treated the same. *Shepherd Montessori Ctr Milan*, 486 Mich at 318; *In re Parole of Hill*, 298 Mich App 404, 420; 827 NW2d 407 (2012).  "Courts apply one of three tests when reviewing a party's challenge of a legislative classification as violative of equal protection.  Which test applies depends on the type of classification made by the statute and the nature of the interest affected." *Proctor v White Lake Twp Police Dep't*, 248 Mich App 457, 469; 639 NW2d 332 (2001).  Because the legislation at issue neither infringes on a fundamental right nor involves a suspect class or quasi-suspect class, rational basis review applies.  *Shepherd Montessori Ctr Milan v Ann Arbor Charter Twp*, 486 Mich 311, 318-319; 783 NW2d 695 (2010).

## 1.  SIMILARLY SITUATED

As a threshold matter, I would find that plaintiffs, who are prisoners, are similarly situated to non-prisoners in regard to the legislation at issue concerning the protection of a person's civil rights.  "In typical equal protection cases, plaintiffs generally allege that they have been arbitrarily classified as members of an identifiable group." *Davis v Prison Health Servs*, 679 F3d 433, 441 (CA 6, 2012) (citation and quotation marks omitted).  See also *Engquist v Oregon Dep't of Agriculture*, 553 US 591, 601; 128 S Ct 2146; 170 L Ed 2d 975 (2008).  Plaintiffs, as an identifiable group, i.e., prisoners,[13] are being treated differently than non-prisoners.  The question then becomes: are prisoners and non-prisoners similarly situated?  This inquiry does not focus on whether the two groups are similarly situated in general, nor is it relevant whether courts have found that prisoners and non-prisoners are not similarly situated in different, unrelated contexts.[14]  Rather, "[t]he similarly situated inquiry focuses on whether the

---

[13] This Court has, in rejecting the assertion that state prisoners are a suspect class, treated prisoners as an identifiable group for purposes of equal protection claims.  See *People v Groff*, 204 Mich App 727, 731; 516 NW2d 532 (1994).

[14] In concluding that plaintiffs, as prisoners, are not similarly situated to non-prisoners, the majority opinion cites several cases in support of its conclusion.  However, the analysis in those cases involved issues that were quite different from the issue in the case at bar, and I find those cases do not resolve the similarly situated issue here.  For instance, the majority cites *Samson v California*, 547 US 843, 848; 126 S Ct 2193; 165 L Ed 2d 250 (2006), and *Hudson v Palmer*, 468 US 517, 525-526; 104 S Ct 3194; 82 L Ed 2d 393 (1984); however, those cases simply stated that prisoners—or probationers in the case of *Sampson*—do not enjoy the same liberties as the average citizen does.  The other cases cited by the majority pertained to issues that are unrelated to the challenged governmental action in this case.  See *Niemic v UMass Correctional*

plaintiffs are similarly situated to another group *for purposes of the challenged government action.*" *Klinger v Dep't of Corrections*, 31 F3d 727, 731 (CA 8, 1994) (emphasis added). Hence, the issue is whether plaintiffs are similarly situated to non-prisoners in regard to their entitlement to civil rights protection and the ability to seek redress from the government for civil rights violations. This inquiry requires consideration of whether plaintiffs are similar to non-prisoners "in all relevant respects," but does not require that plaintiffs are identical to non-prisoners in all respects. See *Nordlinger v Hahn*, 505 US 1, 10; 112 S Ct 2326; 120 L Ed 1 (1992) ("It [the Equal Protection Clause] keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Although it is axiomatic that prisoners and non-prisoners are not similarly situated in every respect, I would find that, for purposes of the challenged governmental action in this case, they are similarly situated in all relevant respects. I see no reason why prisoners are any different in regard to their entitlement to remedying civil rights violations. Just like non-prisoners, prisoners are interacting with and receiving *at least some level* of services from the government on a regular basis. For instance, prisoners receive food, shelter, protection, discipline at times medical care, and a host of other benefits from the government. See *Johnson*

*Health*, __ F Supp 3d __ (D Mass, 2015) (finding that prisoners were not similarly situated to non-prisoners for purposes of administering certain medical treatment); *Pratt v GEO Group, Inc*, 802 F Supp 2d 1269, 1272 (WD Okla, 2011) (declaring that prisoners were not similarly situated to non-prisoners for purposes of applying the statute of limitations to certain claims); *Hertz v Carothers*, 174 P3d 243, 248 (Alas, 2008) (prisoners were not similarly situated to non-prisoners for purposes of certain filing fees); *McGuire v Ameritech Servs, Inc*, 253 F Supp 2d 988, 1001 (SD Ohio, 2003) (prisoners and non-prisoners were not similarly situated for purposes of claims relating to collect telephone calls between prisoners and non-prisoners); *Smith v Corcoran*, 61 Fed Appx 919 (CA 5, 2003) (prisoners not similarly situated to non-prisoners for purposes of a claim that the postal inspector unjustly refused to investigate the plaintiff's claim of mail tampering); *Roller v Gunn*, 107 F3d 227, 234 (CA 4, 1997) (prisoners and non-prisoners not similarly situated with regard to the payment of certain filing fees); *Rudolph v Cuomo*, 916 F Supp 1308, 1323 (SD NY, 1996) (held that prisoners were not similarly situated to non-prisoners for purposes of obtaining an indigency waiver for Motor Vehicle and Parks laws on surcharges); *Scher v Chief Postal Inspector*, 973 F2d 628, 683-684 (CA 8, 1992) (prisoners not similarly situated to non-prisoners for purposes of complaints about mail tampering); *Hrbek v Farrier*, 787 F2d 414, 417 (CA 8, 1986) (prisoners were not similarly situated as non-prisoners with regard to a claim that prison officials' withholding of a portion of wages earned by an inmate on work release).

Lastly, I find the primary Michigan case on which the majority relies, *People v Maxson*, 181 Mich App 133, 135; 449 NW2d 422 (1989), to be distinguishable. Contrary to the majority's conclusions, I find that the entitlement to civil rights while receiving services from the government is markedly different, for constitutional purposes, than a situation concerning whether prisoners and non-prisoners are similarly situated in respect to a prosecutor's decision about whether to prosecute the possession of metallic knuckles. One involves certain rights that are otherwise guaranteed to all, and the other involves the allocation of prosecutorial resources being weighed against internal prison disciplinary decisions.

*v Wayne Co*, 213 Mich App 143, 152; 540 NW2d 66 (1995) ("The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement, ensure that inmates receive adequate food, shelter, and medical care, and take reasonable measures to guarantee the safety of the inmates.").[15]  See also *Neal II*, 232 Mich App at 736-737.  Nothing about the nature of their confinement suggests that prisoners should be treated any differently than non-prisoners with regard to civil rights protections.  It has never been argued in this case that there are any safety justifications for treating prisoners and non-prisoners differently in regard to their ability to claim protections to civil rights.  Nor do any such safety concerns seem apparent in this case.  In short, prisoners and non-prisoners are similar in respect to their entitlement to civil rights protections in their interactions with the government.  Therefore, I would find that, for purposes of claiming redress for violation of their civil rights, prisoners are similarly situated to non-prisoners in regard to receiving certain benefits and services from the State.

Defendants argue, and the majority agrees, that because prisoners receive services and benefits from the government involuntarily, by nature of the fact that their incarceration is not voluntary, they are not similarly situated to non-prisoners.  While it is true that, but for involuntary confinement mandated by the State, prisoners would not be inclined to take residence inside prison walls, I do not believe that the involuntary receipt of services changes the equation.  That is, I do not agree that those who involuntarily interact with the government are any less deserving of the right to protection of their civil rights and a remedy for violations upon those rights than those who voluntarily do so.  To this end, I would note that nearly all citizens are compelled, at times, to receive public services in a manner that is somewhat less than voluntary.  For instance, children under a certain age are compelled to attend school,[16] to some degree, yet no one would dispute that children receive public services while they attend public school.  Likewise, litigants may be required, subject to the court's contempt powers, to appear at certain court proceedings, but no one would contend that they do not receive public services simply by virtue of the fact that their presence in court was not entirely voluntary.  And, for that matter, most trips to the Secretary of State offices are not entirely voluntary.  For example, if left to their own accord, most citizens would likely not find it convenient or necessary to register and pay taxes on a newly-purchased motor vehicle or boat; rather, they do so because the State requires them to do so.  Along a similar vein, prisoners reside in prison and receive certain services therein because the State mandates that they do so.  Furthermore, even assuming that prisoners were the only ones who received public services in a manner that was less than voluntary, I fail to see any reason why this prevents prisoners from being similarly situated to non-prisoners in regard to their entitlement to civil rights. Regardless of whether the receipt of services is voluntary or involuntary, the fact remains that all citizens are in a position where they expect, rightfully, to have certain civil rights honored in their respective dealings with the

---

[15] In fact, one could argue that the average prisoner has far more encounters with government actors on a daily basis than does the average citizen.  Prisoners' entire existence in prison is dependent upon and supported by government actors.  Thus, in comparison to non-prisoners, prisoners have far more potential encounters during which they need the protections of the ELCRA.

[16] See MCL 380.1561, outlining compulsory school attendance as well as certain exceptions.

government.[17]  Thus, in my view, prisoners and non-prisoners are similarly situated with regard to their entitlement to civil rights in dealings with the government because, regardless of a person's abode—either behind bars and concrete blocks or in a two-story colonial—he or she is still entitled to basic civil rights that are otherwise guaranteed to all.

## 2.  RATIONAL BASIS REVIEW

Because I would find that plaintiffs, as prisoners, are similarly situated to non-prisoners for purposes of the challenged legislation, the salient inquiry becomes whether the classification drawn in this case can withstand rational basis review.  "Under the rational basis test, the challenged legislation 'is presumed constitutional, and the party challenging it bears a heavy burden of rebutting that presumption.' "  *In re Parole of Hill*, 298 Mich App at 421, quoting *People v Idziak*, 484 Mich 549, 570; 773 NW2d 616 (2009).  "Specifically, '[t]o prevail under this highly deferential standard of review, a challenger must show that the legislation is arbitrary and wholly unrelated in a rational way to the objective of the statute.' "  *In re Parole of Hill*, 298 Mich App at 422, quoting *Idziak*, 484 Mich at 570-571.  Rational basis review "is a paradigm of judicial restraint" and "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Fed Communications Comm v Beach Communications, Inc*, 508 US 307, 313-314; 113 S Ct 2096; 124 L Ed 2d 211 (1993).  Indeed, rational basis review acknowledges that

> Most laws classify, and many affect certain groups unevenly, even though the law itself treats them no differently from all other members of the class described by the law.  When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern. [*Personnel Admin of Massachusetts v Feeney*, 442 US 256, 271-272; 99 S Ct 2282; 60 L Ed 2d 870 (1979).]

Nevertheless, the United States Supreme Court has cautioned, "even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation."  *Heller v Doe*, 509 US 312, 321; 113 S Ct 2637; 125 L Ed 2d 257 (1993).  "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne, Texas v Cleburne Living Ctr*, 473 US 432, 446; 105 S Ct 3249; 87 L Ed 2d 313 (1985).  When a right is afforded, "it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause."  *Lindsey v Normet*, 405 US 56, 77; 92 S Ct 862;

---

[17]  I acknowledge that prisoners do not enjoy all the rights of non-prisoners.  Among others, prisoners are subject to having all telephone calls and other communications monitored, are subject to searches and seizures without a warrant, and have various other freedoms curtailed for purposes of safety and other legitimate reasons.  Nevertheless, I do not believe that this changes the equation.  The pertinent analysis concerns not whether prisoners and non-prisoners are similarly situated with regard to those freedoms; instead, the analysis concerns whether the two groups are similarly situated for purposes of seeking redress for civil rights violations.  I see no meaningful reason to treat the groups differently for that purpose.

-15-

31 L Ed 2d 36 (1972).  "Furthermore, some objectives—such as a bare desire to harm a politically unpopular group are not legitimate state interests."  *City of Cleburne*, 473 US at 446-447 (citation and quotation marks omitted).  See also *United States v Windsor*, __ US __; 133 S Ct 2675, 2693; 186 L Ed 2d 808 (2013); *United States Dep't of Agriculture v Moreno*, 413 US 528, 534; 93 S Ct 2821; 37 L Ed 2d 782 (1973).

### C.  THE CHALLENGED LEGISLATION LACKS A RATIONAL BASIS

Even under the deferential rational basis standard, I would find that the classification drawn in this case, which prevents prisoners, but no one else, from seeking relief under the ELCRA, violates equal protection.  Like the court in *Mason v Granholm*, unpublished opinion of the Eastern District Court of Michigan, issued January 23, 2007 (Docket No. 05-73943),[18] my reasoning on this issue is guided by the Supreme Court's decision in *Romer v Evans*, 517 US 620; 116 S Ct 1620; 134 L Ed 2d 855 (1996).  At issue in *Romer* was an amendment to the Colorado Constitution, "Amendment 2," which prohibited all legislative, executive, or judicial action at any level of state or local government designed to protect homosexual individuals.  *Id*, 517 US at 623-624.  The Court held that Amendment 2 failed rational basis review for two reasons.  First, "the amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legislation."  *Id.* at 632.  The amendment was "at once too narrow and too broad. It identifies persons by a single trait and then denies them protection across the board."  *Id.* at 633.  The Court explained that "[e]qual protection of the laws is not achieved through indiscriminate imposition of inequalities."  *Id.* (citations and quotation marks omitted).

> Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare.  A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense.  [*Id.*]

As for the second reason identified by the *Romer* Court for concluding that Amendment 2 failed rational basis review, the Court found that the "shear breadth" of the amendment was "so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects . . . ."  *Id.* at 632.  If the concept of equal protection was to mean anything, reasoned the Court, " 'it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.' "  *Id.* at 634, quoting *Moreno*, 413 US at 534.  The classification in that case could not be explained by any of the proffered rationales; thus, Amendment 2 did not bear a rational relationship to a legitimate governmental purpose.  *Id.* at 635.

---

[18] Plaintiffs argue that this Court is bound by the decision in *Mason*.  I believe the majority accurately concludes that we are not bound by an unpublished federal district court decision. The majority also correctly concludes that the application of offensive non-mutual collateral estoppel is not appropriate in this case.

-16-

Similarly, where the 1999 amendment falls short is that it paints with far too broad a brush. It targets a specific group—prisoners—and prevents that group, and only that group, from filing claims under the ELCRA. As recognized in *Romer*, 517 US at 633, "[c]entral both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance." It is for that reason that a law singling out a particular class and imposing hardships on that class "is itself a denial of equal protection of the laws in the most literal sense." *Id.* Here, the law imposes a hardship—no statutory relief for civil rights violations—on only one group. The decision to single out this particular group and categorically deny prisoners, and only prisoners, the ability to seek relief renders the constitutionality of the 1999 amendment doubtful from the onset. See *id.*

Further, just as in *Romer*, this targeted classification bears no rational relationship to a legitimate governmental interest. Two primary rationales have been advanced for justifying the classification at issue: (1) maintaining prison order; (2) preventing frivolous actions and preserving the public fisc. As to the first proffered rationale, I agree with the majority's conclusion that there is no merit to defendants' assertion that the challenged statute is rationally related to the legitimate governmental interest of prison order and management. There does not appear to be any connection between limiting a prisoner's ability to seek relief under the ELCRA and maintaining prison order.

Where I diverge from the majority opinion is in the conclusion that the second offered purpose—deterrence of frivolous and meritless lawsuits and maintaining the public fisc—does not suffice as a rational basis in this case. There is no doubt that deterring frivolous lawsuits is designed to and does protect the public fisc, and that doing so is a legitimate government purpose. See *Barlett v North Ottawa Comm Hosp*, 244 Mich App 685, 695; 625 NW2d 470 (2001) ("Deterring the filing of frivolous lawsuits against any party or group is a legitimate governmental interest."). Also, it is well established that prisoners, as a group, tend to file more litigation than non-prisoners. See, e.g., *Johnson v Daley*, 339 F3d 582, 592 (CA 7, 2003). The proper inquiry is whether the ends in this case legally justify the means. In other words, is the connection between preventing frivolous lawsuits by prisoners and maintaining the public fisc and the decision to deny an identifiable class of individuals protections under the ELCRA—an act designed to protect the civil rights of all persons—too attenuated such that the classification is arbitrary? Given the sweeping prohibitions drawn by the classification at issue and that it completely severs the rights of inmates to seek redress for violations of civil rights—rights which are regarded as those that should be given the "highest priority," in terms of protection, see *Barczak v Rockwell Intern Corp*, 68 Mich App 759, 763; 244 NW2d 24 (1976), I find the restriction arbitrary and contrary, if not repugnant, to the ideals of equal protection. The only discernible purpose of the 1999 amendment is to snuff out all lawsuits filed by prisoners.

Indeed, rather than targeting frivolous claims, the only purpose of the 1999 amendment is the elimination of prisoners' ability to bring claims of *any kind* under the ELCRA and to limit the State's liability in civil rights claims by prisoners. This cannot serve as a legitimate government purpose. See *Johnson*, 339 F3d at 612 (ROVNER, J., dissenting) ("The government . . . does not and cannot argue that [the Legislature] has a legitimate interest in discouraging meritorious litigation by inmates."). See also *Rodriguez v Brand West Dairy*, __ P3d __ (Docks Nos. 33,104; 33,675, issued June 22, 2015, New Mexico Court of Appeals), slip

op at 15-18 (holding that a New Mexico statute that excluded from the scope of workers' compensation coverage farm and ranch laborers violated equal protection because the classification drawn was arbitrary and not rationally related to the goal of preserving resources); *Willoughby v Washington Dep't of Labor & Indus*, 147 Wash 2d 725, 737; 57 P3d 611 (2002) (invalidating, on equal protection grounds, a statute that barred the distribution of industrial insurance permanent partial disability benefits to prisoners because the statute was unrelated to a legitimate governmental purpose and "saving money is not a sufficient ground for upholding an otherwise unconstitutional statute in any event."). There is simply no effort in the 1999 amendment to target frivolous claims; rather, the amendment is a blunt and obtuse prohibition on all claims, regardless of merit, under the ELCRA. Although "equal protection analysis does not require that every classification be drawn with precise 'mathematical nicety[,]' the classification drawn in this case is more than merely imprecise, "it is wholly without any rational basis." *Moreno*, 413 US at 538. See also *Mason*, unpub op at *4 (concluding that the ELCRA was "too broad to be rationally related to" the asserted governmental interests of "deterring frivolous suits and protecting the public treasury"). In my view, the 1999 amendment's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Romer*, 517 US at 632.[19]

_____

[19] The majority cites cases such as *Morales*, 260 Mich App at 52 (finding that legislation precluding prisoners from appealing the decision of the parole board was rationally related to the legitimate governmental interest in saving funds in response to frivolous requests by prisoners), and *Proctor*, 248 Mich App at 469 (no equal protection violation in the Legislature's decision to single out incarcerated prisoners with regard to FOIA exclusions, based on the conclusion that prisoners often file frivolous requests). I find these cases to be unavailing. Initially, the rational basis analysis in both cases was rather cursory, as *Proctor*, 248 Mich App at 469, summarily concluded "that the Legislature's FOIA exclusions singling out incarcerated prisoners rationally relate to the Legislature's legitimate interest in conserving the scarce governmental resources squandered responding to frivolous FOIA requests by incarcerated prisoners." The pertinent analysis in *Morales* was similarly short, as the opinion cited *Proctor* and concluded that "the exclusion of prisoners' ability under MCL 791.234 to appeal parole denials is rationally related to the Legislature's legitimate interest in saving public funds in response to innumerable frivolous requests by incarcerated prisoners for the review of the Parole Board's denials of parole." Moreover, the statutes at issue in both cases were significantly different from the 1999 amendment to the ELCRA. Notably, the ELCRA places an outright ban on *all* prisoner actions under the ELCRA, a ban which is contrary to the constitutional directive contained in Const 1963, art 1, § 2. By contrast, *Morales* dealt with parole, a right to which prisoners are not entitled. And, the prisoners in *Morales* were afforded *at least some* review of their parole eligibility, as the parole board had to first make a determination as to eligibility; here, by comparison, the 1999 amendment cuts off all review from the outset. As to *Proctor*, I would not consider the denial of a FOIA request to be of the same importance as an individual's ability to seek redress for constitutionally guaranteed civil rights. Moreover, I would note that the existence of the PLRA makes the instant case different from both *Morales* and *Proctor*. That is, the PLRA is already a targeted attempt at curtailing frivolous prisoner litigation with regard to

In addition, I find it significant that, independent of the 1999 amendment, the Legislature had already enacted several, more targeted statutes designed to ferret out frivolous prison litigation. These more targeted statutes are found in the PLRA, and include, among others, the pleading requirements discussed in Issue I, MCL 600.5507, the exhaustion of administrative remedies, MCL 600.5503(1), various screening provisions that call for dismissal set forth in the PLRA, including those that impose a duty on courts to review complaints and dismiss frivolous claims, such as MCL 600.5503(2), MCL 600.5505(2), MCL 600.5509(1)-(2), as well as the list maintained by the state court administrator's office of the frivolous civil actions brought by prisoners concerning prison conditions, MCL 600.5529. "The existence of these provisions necessarily casts considerable doubt upon the proposition" that the 1999 amendment "could rationally have been intended to prevent those very same" concerns. See *Moreno*, 413 US at 536-537 (explaining that where other safeguards in the Food Stamp Act already existed, the challenged provision, which excluded from eligibility for food stamps those individuals who resided with non-relatives, was not rationally related to a legitimate governmental purpose and instead was arbitrary). Given the existence of the much more targeted safeguards in the PLRA, it is dubious whether the 1999 amendment was intended to target frivolous claims.

Defendants attempt to rationalize the prohibition placed on prisoners' abilities to bring claims under the ELCRA by arguing that prisoners can still seek injunctive and declaratory relief under the Constitution for civil rights violations; therefore, according to defendants, the classification is permissible. At first glance, this argument has some appeal, but upon further inquiry, it is found to be wanting.[20] The argument removes the focus from the proper inquiry in this case. The pertinent inquiry is not concerned with what *other* avenues of relief are available to prisoners. Rather, the salient concern focuses on the classification drawn in the statute at issue and whether that classification is wholly arbitrary or whether it is rationally related to a legitimate governmental interest. See *Baxstrom v Herold*, 383 US 107; 86 S Ct 760; 15 L Ed 2d 620 (1966) (focusing on the classification drawn, not external concerns).[21] And, as noted above,

prison conditions. The statutes at issue in *Morales* and *Proctor* lacked this type of aggressive safeguard against frivolous actions. Thus, unlike the statutes at issue in *Morales* and *Proctor*, the likelihood that the 1999 amendment was rationally related to the asserted interest of curtailing frivolous actions is significantly lessened.

[20] I also note that from a practical standpoint, prisoners who cannot afford to fund their own lawsuit seeking declaratory or injunctive relief would be hard pressed to find anyone but a pro bono or nonprofit attorney willing to take their case; other than pursuing a case in pro per, the lack of financial redress effectively limits a prisoner's access to the courthouse in seeking to enforce his or her constitutional rights. And again, it is only prisoners who are carved out from relief under the ELRCA.

[21] I find it particularly troubling that the Legislature would choose to preclude monetary relief for something as significant as civil rights violations. Civil rights actions have long been recognized as significant, not only for the litigants but for the public at large. See, e.g., *Rivera*, 477 US at 574. Not only that, but a damages remedy has been recognized as an integral component of remedying civil rights violations. See *Owen v City of Independence, Mo*, 445 US 622, 651; 100 S Ct 1398; 63 L Ed 2d 673 (1980) ("A damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees, and the

I would conclude that the classification is not rationally related to a legitimate governmental interest.

I find the classification drawn in this case particularly troubling in light of the constitutional mandate established in Const 1963, art 1, § 2, which is emphasized and discussed in detail in Part II of this opinion. The Constitution prohibits discrimination against "any person," and requires the Legislature to implement that directive. In enacting the 1999 amendment at issue, the Legislature, rather than honoring that mandate as to "any person," has spurned an identifiable group of individuals. The mandate did not say "all to whom you feel like giving the privilege"; it said "all" without limitation. In this respect, the Legislation is nothing but a targeted curtailment of the rights of prisoners to seek the very same relief that all others enjoy. This targeted curtailment of the right of prisoners to seek the very same relief that is available to all others appears, in my mind, so incongruous with the purpose of legislation that was designed to protect civil rights that it is capricious and unrelated to any legitimate governmental purpose. See *Windsor*, __ US at __; 133 S Ct at 2693 ("The Constitution's guarantee of equality must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot justify disparate treatment of that group."); *Moreno*, 413 US at 534 ("For if the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). See also *Mason*, unpub op at *4 (noting that "[t]he ELCRA amendment denies prisoners the basic protections against discrimination that all others are afforded under Michigan law, *as required by*" Const 1963, art 1, § 2, and concluding that "[t]here is no rational basis for denying *all* prisoners . . . and no one else[ ] the ability to seek redress for illegal discrimination that occurred in prison."). Thus, in addition to demonstrating that the 1999 amendment is unconstitutional because it contravenes the Legislative mandate, the betrayal of the mandate also illustrates the capriciousness of the amendment, thereby eroding the asserted rational basis for the legislation.

I am also troubled by the implications of the majority's decision. The 1999 amendment provides no avenue for monetary relief, and, potentially, no redress whatsoever under state law for any type of discrimination not articulated in Const 1963, art 1, § 2, e.g., discrimination based on age, sexual orientation, marital status, or gender. With no threat of a monetary judgment, or, perhaps in some cases, any judgment at all, no state law would stand in the way of prisons and prison officials intentionally discriminating against prisoners based on certain qualifications that would be prohibited in all other walks of life. For instance, the majority's decision would provide no remedy under state law if prison officials, with no consideration of security concerns or other penological interests, simply denied certain services or benefits, such as educational classes, exercise time, or countless others, to certain classifications of prisoners with no ramification under the ELCRA. And, for that matter, there would be no damages available under

importance of assuring its efficacy is only accentuated when the wrongdoer is the institution that has been established to protect the very rights it has transgressed."); *Davis v Passman*, 442 US 228, 245; 99 S Ct 2264; 60 L Ed 2d 846 (1979). Further, damages have been recognized as "particularly beneficial" in cases such as this one that allege "those 'systemic' injuries that result not so much from the conduct of any single individual, but from the interactive behavior of several government officials . . . ." *Owen*, 445 US at 652.

the ELCRA if prison officials drew those classifications based on prisoners' race. And, the majority's decision would provide no remedy under state law against sexual harassment—a type of sexual discrimination, per MCL 37.2103(i), under the ELCRA. In other words, prison guards and other officials could perpetuate sexual harassment that would, in all other walks of life, be unquestionably banned by the ELCRA, and, by some twisted sense of irony, be insulated from liability under state law by the very same act. As pointed out by plaintiffs, the 1999 amendment only applies to those serving a sentence of imprisonment. Thus, guards and prison officials could sexually harass inmates and face no liability under state law, but face liability under the ELCRA for the very same conduct if it were committed against a visitor to the prison, rather than an inmate. The simple, arbitrary fact that one victim in this scenario wore an orange jumpsuit and the other wore street clothes would insulate the guards and prison officials under the ELCRA. This, in my mind, highlights the capricious nature of the 1999 amendment and why it cannot withstand even the most deferential rational basis review. See *City of Cleburne*, 473 US at 446 ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."). See also *Baxstrom*, 383 US at 115 ("The capriciousness of the classification employed by the State is thrown sharply into focus by the fact that the" benefit at issue was withheld only in regard to certain incarcerated individuals). The ELCRA, an act designed to protect civil rights, should not be used as a safe harbor against claims of sex discrimination—or any type of discrimination for that matter.

The implications of the majority's decision are even more troubling in light of the fact that it would completely bar, regardless of the merits of the case, any liability on the part of the State for the conduct alleged in this case, which was an ongoing and well-documented problem.[22] The conduct alleged in this case, sexual assaults committed against young inmates, is not a new or unheard of problem. The Federal Prison Rape Elimination Act (PREA), 42 USC 15601(4), enacted in 2003, expressly recognized this very issue, stating that "[y]oung first-time offenders are at increased risk of sexual victimization. Juveniles are 5 times more likely to be sexually assaulted in adult rather than juvenile facilities—often within the first 48 hours of incarceration." While, for the past 12 years the federal government has been aware of and attempting to eradicate the very problem alleged to have occurred in this case—the sexual assault of juvenile prisoners—Michigan has been trying to eliminate the rights of juveniles—and other prisoners— to seek monetary relief for this and other civil rights violations. I cannot, in good conscience, countenance this attempt at shirking liability and responsibility.

In sum, although I find that the issue need not be reached because the unconstitutionality of the 1999 amendment is apparent for the reasons discussed in Section II of this dissent, I would conclude that the amendment violates equal protection because it draws a classification between similarly situated individuals and that classification is not rationally related to a legitimate governmental interest.

---

[22] This should not be viewed as a substantive evaluation of the merits of plaintiffs' claims in the instant case.

## IV. REMAINING ARGUMENTS

Lastly, defendants argue that the trial court should have granted their motion for summary disposition under MCR 2.116(C)(8), claiming that plaintiffs failed to adequately allege that they had notice of the conduct at issue.[23] This Court reviews de novo motions for summary disposition. *Citimortgage, Inc v Mortgage Electronic Registration Sys, Inc*, 295 Mich App 72, 75; 813 NW2d 332 (2011). Summary disposition is proper under MCR 2.116(C)(8) if "[t]he opposing party has failed to state a claim on which relief can be granted." A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint on the allegations of the pleadings alone. *Feyz v Mercy Mem Hosp*, 475 Mich 663, 672; 719 NW2d 1 (2006). A reviewing court on a (C)(8) motion "must accept as true all factual allegations supporting the claim, and any reasonable inferences or conclusions that might be drawn from those facts." *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 131; 839 NW2d 223 (2013). In addition, a court must construe all well-pleaded allegations in a light most favorable to the nonmoving party. *Johnson v Pastoriza*, 491 Mich 417, 435; 818 NW2d 279 (2012). "A motion under MCR 2.116(C)(8) may be granted only when the claims alleged "are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id.* (citation and quotation marks omitted).

Plaintiffs brought claims under the ELCRA against defendant for sex discrimination (hostile environment) and age discrimination. Defendants do not address plaintiffs' claims individually; instead, they argue that plaintiffs' claims must fail because they lacked notice of the alleged harassment. In addition, defendants' arguments only appear to pertain to plaintiffs' claims about sex discrimination. As such, I only evaluate defendants' arguments as to the claims of sex discrimination.

Under the ELCRA, discrimination on the basis of sex, which includes, by definition, sexual harassment, is prohibited. MCL 37.2103(i). The act defines sexual harassment to include:

> unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:

---

[23] Defendants raised this argument before the trial court, but the court did not rule on the matter. Because the issue was preserved by virtue of defendants having raised it before the trial court, see *Klooster v Charlevoix*, 488 Mich 289, 310; 795 NW2d 578 (2011), and because I would remand for dismissal without prejudice, see Issue I, I find it necessary to weigh in on defendants' argument.

(*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.

(*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

(*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. [MCL 37.2103(i).]

The last category is at issue in this case; this type of harassment "is commonly labeled hostile environment harassment." *Chambers v Trettco, Inc*, 463 Mich 297, 310; 614 NW2d 910 (2000).

To establish hostile environment harassment, a plaintiff in a case such as this one must prove:

(1) the [plaintiff] belonged to a protected group;

(2) the [plaintiff] was subjected to communication or conduct on the basis of sex;

(3) the [plaintiff] was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the [plaintiff's public services or creates a hostile environment with regard to those public services]; and

(5) respondeat superior. [*Radtke v Everett*, 442 Mich 368, 382-383; 501 NW2d 155 (1993).]

At issue in this case is the fifth element, respondeat superior. Plaintiffs seek to hold defendants vicariously liable for acts committed by their respective agents. In a hostile environment claim, an employer may avoid liability for hostile environment harassment if, upon notice of the alleged harassment, it adequately investigated and took prompt and appropriate remedial action. *Id.* Thus, a defendant must have actual or constructive notice of the alleged harassment before liability will attach. *Sheridan v Forest Hills Public Schs*, 247 Mich App 611, 621; 637 NW2d 536 (2001). A plaintiff can demonstrate notice if he or she complained to "higher management" about the harassment, or "by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* (citation and quotation marks omitted). "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers*, 463 Mich at 319.

Taking the allegations raised in plaintiffs' complaint as true and construing them in a light most favorable to plaintiffs, as is required under MCR 2.116(C)(8) review, see *Johnson*, 491 Mich at 435; *Gorman*, 302 Mich App at 131, I would find that defendants were not entitled to summary disposition because factual development could possibly justify recovery on plaintiffs' sexual harassment claims. Most notably, I find that because of the pervasiveness of the harassment and sexual violence alleged, plaintiffs sufficiently pleaded knowledge on the part of defendants that a hostile environment existed at each of the facilities. Plaintiffs raised numerous allegations of abuse at all of the correctional facilities. These allegations included claims that some of the plaintiffs were repeatedly and continuously harassed and/or sexually assaulted by adult male prisoners. Some plaintiffs were harassed and assaulted at multiple Michigan Department of Corrections (MDOC) facilities following transfers. According to plaintiffs' complaint, some of the assaults/harassment occurred in front of MDOC staff members and/or were even facilitated at times by MDOC staff opening cell doors to allow prisoners to commit the assaults. The complaint alleged that the assaults were committed in an open and obvious manner, and that there was medical evidence documenting some of the sexual assaults. All of this is in addition to the fact that the complaint alleged that some of the complained-of sexual assaults were perpetrated by MDOC staff members or that MDOC staff members threatened to help facilitate sexual assault against plaintiffs as punishment. These facts, taken in a light most favorable to plaintiffs, show wide-spread, pervasive sexual assaults at several MDOC facilities.

Furthermore, regarding the harassment perpetrated by adult male prisoners, all of which was alleged to have occurred between the fall of 2010 and December 2013, plaintiffs alleged that the MDOC placed prisoners between the ages of 14 and 17 in adult prisons and that it maintained a policy of placing 17-year-old prisoners in cells with adult prisoners. Plaintiffs also alleged that the MDOC failed to separate juvenile prisoners from adult prisoners in various programming, showers, yards, and eating areas. All of this, despite the fact that the PREA, which was enacted in 2003, was expressly designed to prevent youthful inmates from being "placed in a housing unit in which the youthful inmate will have sight, sound, or physical contact with any adult inmate through use of a shared dayroom or other common space, shower area, or sleeping quarters." 28 CFR 115.14. Given the directives of the PREA and the allegations that defendants took actions that were contrary to those directives, combined with the pervasiveness of the alleged harassment, I find that plaintiffs sufficiently pleaded facts to establish that defendants had knowledge or should have had knowledge of a hostile environment in all 10 facilities at issue. See *Chambers*, 463 Mich at 319; *Sheridan*, 247 Mich App at 621. Plaintiffs are not, as defendants contend, trying to hold defendants "strictly liable" for the alleged sexual assaults. Rather, they are, as is demonstrated by their numerous allegations, attempting to hold defendants liable for failing to remedy a hostile environment—an environment that defendants either knew about or should have known about—based on the facts alleged. Defendants were not entitled to summary disposition under MCR 2.116(C)(8). See *Johnson*, 491 Mich at 435.

IV. CONCLUSION

Because I am bound by existing precedent interpreting the PLRA, I concur with the majority in regard to the issue of whether dismissal was required under MCL 600.5507(3), although dismissal would be without prejudice. In all other respects, I respectfully dissent from the majority decision. I would affirm the trial court's declaration that the 1999 amendment to the

ELCRA is unconstitutional; however, I would do so on the alternate ground that the statutory amendment contravenes the clear and express directive given to the Legislature in Const 1963, art 1, § 2 to protect the civil rights of all persons. I would also find that the amendment is unconstitutional because it fails the rational basis test. Finally, I would find that plaintiffs pleaded sufficient claims to survive a motion for summary disposition under MCR 2.116(C)(8).


/s/ Jane M. Beckering